# United States Court of Appeals
# For the Eighth Circuit

SAMANTHA STINSON, *et al.*,
*Plaintiffs-Appellees,*

JULEE JAEGER, *et al.*,
*Plaintiffs-Appellees,*

CHRISTINE BENSON, *et al.*,
*Plaintiffs-Appellees,*

v.

FAYETTEVILLE SCHOOL DISTRICT NO. 1, *et al.*,
*Defendants,*

CONWAY SCHOOL DISTRICT, NO. 1,
*Defendant,*

LAKESIDE SCHOOL DISTRICT, NO. 9,
*Defendant,*

STATE OF ARKANSAS,
*Intervenor-Appellant.*

On Appeal from the United States District Court for the Western District of
Arkansas, No. 5:25-cv-05127 (Hon. Timothy L. Brooks)

## Intervenor-Appellant's Opening Brief

TIM GRIFFIN
  Arkansas Attorney General

OFFICE OF THE ARKANSAS
ATTORNEY GENERAL

101 West Capitol Avenue
LITTLE ROCK, AR 72201
(501) 682-2007

AUTUMN HAMIT PATTERSON
  Solicitor General

NOAH P. WATSON
  Deputy Solicitor General

LAURA PURVIS
  Assistant Attorney General
autumn.patterson@arkansasag.gov
*Counsel for Defendant-Appellant*

## Summary of the Case and Statement Regarding Oral Argument

In 2025, Arkansas passed Act 573 requiring schools to post historical Ten Commandments displays if they received donations. Before a Ten Commandments display was ever posted (or even donated) and before knowing what they would look like or their surrounding context, Plaintiffs filed suit asserting Establishment and Free Exercise Clause claims. They assumed that displays would be posted in their classrooms and that their context would be offensive and coercive. And the district court granted a preliminary injunction based on that assumption. Then, after that order was on appeal, it proceeded to repeatedly allow Plaintiffs to add new parties to the case and issued additional preliminary injunctions.

This consolidated appeal raises several important questions, such as whether offended-observer standing based on a hypothetical future encounter with a display can satisfy Article III, what actions a district court can take while an appeal is pending, whether requiring schools to post donated Ten Commandments displays resembles an establishment as originally understood, whether a passive Ten Commandments display can substantially burden an observer's free-exercise rights, and the scope of courts' authority to issue injunctions. Given the number of significant issues raised, the State respectfully requests 20 minutes for oral argument.

# TABLE OF CONTENTS

Summary of the Case and Statement Regarding Oral Argument ............................i

Table of Contents ...................................................................................ii

Table of Authorities ..............................................................................iv

Jurisdictional Statement......................................................................... 1

Statement of Issues ................................................................................ 1

Statement of the Case ............................................................................ 3

    A.  After the Arkansas Legislature passed Act 573, Plaintiffs
        sought pre-enforcement injunctive relief against four
        school districts................................................................................ 3

    B.  Arkansas intervened to defend Act 573 ....................................... 5

    C.  The district court denied Arkansas's motions to dismiss
        and exclude Plaintiffs' expert and issued a broad
        preliminary injunction.................................................................. 7

    D.  After Arkansas appealed, the district court allowed
        Plaintiffs to repeatedly modify their complaint and
        issued additional injunctions ........................................................ 9

Summary of Argument........................................................................... 12

Argument............................................................................................... 13

I.  Standard of Review ........................................................................ 13

II.  Plaintiffs' Claims Are Not Justiciable............................................ 14

    A.  Hypothetical offended-observer standing does not satisfy
        Article III .................................................................................... 14

B. Later-added parties do not cure the original jurisdictional defect ............... 17

III. Plaintiffs Failed to Show Likely Success………… ...........................................20

    A. Plaintiffs' establishment claim fails .............................................. 21

       1. *Stone* is not binding ................................................................. 21

       2. Even if *Stone* remained good law, it cannot be applied here. ...................27

       3. Act 573 has no hallmark of religious establishment.................................. 31

       4. Plaintiffs cannot show that Act 573 displays are coercive ......................38

    B. Plaintiffs' free-exercise claim fails................................................. 42

       1. Act 573 is a neutral, generally applicable law that does not
          burden religious exercise........................................................ 43

       2. Act 573 does not substantially interfere with Plaintiffs'
          ability to direct student-Plaintiffs' religious upbringing......................... 47

    C. Plaintiffs failed to show likely success on their facial challenges ................. 53

IV. Plaintiffs Failed to Show the Irreparable-Harm, Balance-of-Equities,
    or Public-Interest Factors Justified a Preliminary Injunction .........................56

V. The Preliminary Injunctions Exceed the District Court's Authority ................ 57

Conclusion.................................................................................................58

Certificate of Compliance ......................................................................60

Certificate of Service................................................................................60

## Table of Authorities

**Cases**                                                     **Page(s)**

*ACLU Nebraska Found. v. City of Plattsmouth*,
186 F.Supp.2d 1024 (D. Neb. 2002) ................................ 27

*ACLU Nebraska Found. v. City of Plattsmouth*,
419 F.3d 772 (8th Cir. 2005) (en banc) ................. 2, 27, 34

*ACLU of Ohio v. Capitol Square Rev. & Advisory Bd.*,
243 F.3d 289 (6th Cir. 2001) (en banc) .................. 34, 39, 47

*ACLU-NJ v. Twp. of Wall*,
246 F.3d 258 (3d Cir. 2001) ............................... 15

*Am. Legion v. Am. Humanist Ass'n*,
588 U.S. 29 (2019) .......................... 6, 14, 16, 24

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023) ............................. 2, 17

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................... 1, 17, 52

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022) .......... 2, 21, 25-26, 31-33, 38-41, 47

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ............. 2, 6, 13, 17, 41-44, 47-52

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ......................... 2, 53-54, 57

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................... 3, 56, 57

*B.W.C. v. Williams*,
990 F.3d 614 (8th Cir. 2021) ...................... 2, 43

*Barber v. Bryant*,
860 F.3d 345 (5th Cir. 2017) ....................... 15

*Bauchman v. W. High Sch.*,
132 F.3d 542 (10th Cir. 1997) ............................................... 45

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens*,
496 U.S. 226 (1990) ............................................................. 30

*Bio Gen LLC v. Sanders*,
142 F.4th 591 (8th Cir. 2025) ............................................... 14

*Bowen v. Roy*,
476 U.S. 693 (1986) ............................................................. 44

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................. 57

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ............................................................. 46

*City of Ocala v. Rojas*,
143 S. Ct. 764 (2023) ........................................................... 14

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................. 16

*Croft v. Perry*,
624 F.3d 157 (5th Cir. 2010) ............................................ 2, 54

*Doe No.1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*,
No. 23-3740, 2025 WL 2453836 (6th Cir. Aug. 26, 2025) ........... 46, 49

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ......................................................... 22, 40

*Eggers v. Evnen*,
48 F.4th 561 (8th Cir. 2022) ............................................... 14

*Elk Grove Unified Sch. Dist. v. Newdow*,
542 U.S. 1 (2004) ............................................................... 45

*Fed. Recovery Servs., Inc. v. United States*,
72 F.3d 447 (5th Cir. 1995) ................................................. 20

*Firewalker-Fields v. Lee*,
  58 F.4th 104 (4th Cir. 2023) ........................................................ 25, 32

*In re Fort Worth Chamber of Com.*,
  100 F.4th 528 (5th Cir. 2024) ............................................................ 18

*Ganulin v. United States*,
  71 F. Supp. 2d 824 (S.D. Ohio 1999) ................................................ 47

*Ganulin v. United States*,
  238 F.3d 420 (6th Cir. 2000) ............................................................. 47

*Griggs v. Provident Consumer Discount Co.*,
  459 U.S. 56, 58 (1982) .................................................................. 17, 19

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ........................................................................... 24

*Harley v. Zoesch*,
  413 F.3d 866 (8th Cir. 2005) ............................................................. 18

*Hester v. United States*,
  586 U.S. 1104 (2019 .......................................................................... 30

*Hilsenrath v. Sch. Dist. of Chathams*,
  136 F.4th 484 (3d Cir. 2025) ........................................... 32, 34, 36, 41

*Hilsenrath v. Sch. Dist. of Chathams*,
  No. 25-256, 2025 WL 3506995 (U.S. Dec. 8, 2025) ......................... 33

*Lee v. Weisman*,
  505 U.S. 577 (1992) ........................................................................... 40

*Lynch v. Donnelly*,
  465 U.S. 668 (1984) ........................................................................... 23

*Marsh v. Chambers*,
  463 U.S. 783 (1983) ........................................................................... 22

*Mattice v. Meyer*,
353 F.2d 316 (8th Cir. 1965) ............................ 19

*Miller v. Albright*,
523 U.S. 420 (1998) ...................................20

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) ....................................28

*NetChoice, LLC v. Fitch*,
145 S. Ct. 2658 (2025) ...............................56

*New Doe Child #1 v. United States*,
901 F.3d 1015 (8th Cir. 2018) .............. 2, 26, 31, 33-35, 38-39, 41- 43, 45-47

*Newdow v. Rio Linda Union Sch. Dist.*,
597 F.3d 1007 (9th Cir. 2010) ...................... 27, 49

*Nikolao v. Lyon*,
875 F.3d 310 (6th Cir. 2017) ......................... 43

*State ex rel. Nixon v. Coeur D'Alene Tribe*,
164 F.3d 1102 (8th Cir. 1999) ...................... 2, 19

*Powell v. Noble*,
798 F.3d 690 (8th Cir. 2015) ......................13, 56

*Pressroom Unions-Printers League Income Sec. Fund v. Con't Assur. Co.*,
700 F.2d 889 (2d Cir. 1983) .......................... 19

*Ramirez v. Collier*,
595 U.S. 411 (2022)..................................28

*Red River Freethinkers v. City of Fargo*,
679 F.3d 1015 (8th Cir. 2012) ...................... 1, 14

*Roake v. Brumley*,
141 F.4th 614 (5th Cir. 2025) ........................26

*Roake v. Brumley*,
154 F.4th 329 (5th Cir. 2025) ........................26

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
490 U.S. 477 (1989) ........................................ 26

*Rogers v. Scurr*,
676 F.2d 1211 (8th Cir. 1982) .......................... 57

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000).......................................... 40

*Scahill v. Dist. of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) ......................... 18

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) ..................................... 32, 38

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ......................................... 17

*Stone v. Graham*,
449 U.S. 39 (1980) (per curiam)...............5, 8, 21-23, 25-27, 29- 31

*Town of Greece v. Galloway*,
572 U.S. 565 (2014)....................... 2, 21, 24-25, 31, 39, 41

*United States v. Hansen*,
599 U.S. 762 (2023) ........................................ 54

*United States v. Jackson*,
110 F.4th 1120 (8th Cir. 2024) ......................... 28

*United States v. Jackson*,
145 S. Ct. 2708 (2025)...................................... 28

*Van Orden v. Perry*,
545 U.S. 677 (2005) .................. 4, 6, 16, 23-24, 27, 29, 35

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ....................................... 14, 56

*Wooten v. Roach*,
964 F.3d 395 (5th Cir. 2020) ...................... 2, 18, 19

*Zanders v. Swanson*,
573 F.3d 591 (8th Cir. 2009) ............................................................. 15

**Statutes & Rules**

5 U.S.C. § 6103 ........................................................................... 47

28 U.S.C. § 1292 .......................................................................... 1

28 U.S.C. § 1331 .......................................................................... 1

28 U.S.C. § 1391 ..........................................................................20

Ark. Code Ann. § 1-4-133 ............................................... 3, 15, 27, 29

**Other Authorities**

A. Ides, *The Authority of a Federal District Court to Proceed After a
Notice of Appeal Has Been Filed*, 143 F.R.D. 307 (1992) ..................... 18

D. Arkin and E. Ortiz, *How some Texas teachers are fighting the Ten
Commandments law in classrooms*, NBC News (Sept. 14, 2025),
https://tinyurl.com/3ctny3p6 ........................................................ 16

Gov't Aff. Comm. Hr'g, (Apr. 2, 2025),
https://tinyurl.com/mr28c3za .......................................................28

H. Bickel, Engel *Was Grievously Wrong and Should Be Overruled*,
2023 Harv. J.L. & Pub. Pol'y 1 ...................................................... 35

*H.B. 71 Guidance for Louisiana Schools*,
https://tinyurl.com/45u2pvbm ..................................................... 17

Michael W. McConnell, *Establishment and Disestablishment at the
Founding, Part I*, 44 Wm. & Mary L. Rev. 2105 (2003) ......................34

Nathan S. Chapman, *Forgotten Federal-Missionary Partnerships: New
Light on the Establishment Clause*, 6 Notre Dame L. Rev. 677 (2020) ...............34

S. Hr'g (Mar. 19, 2025), https://tinyurl.com/ydtvfaz9 .........................30

S. State Agencies Hr'g (Mar. 18, 2025), https://tinyurl.com/4xj98ad2 ...............30

Stephanie H. Barclay et al., *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505 (2019)....................35

## Jurisdictional Statement

The district court had jurisdiction under 28 U.S.C. §1331 and issued preliminary injunctions on August 4, September 10, and November 10, 2025. Add. 1; App. 384; R. Doc. 71; Add. 36; App. 520; R. Doc. 111; Add. 39; App. 610; R. Doc. 149. Arkansas timely appealed each one on August 22, September 23, and November 11, 2025, respectively. R. Doc. 78; R. Doc. 117; R. Doc. 150. This Court has jurisdiction over the consolidated appeals under 28 U.S.C. § 1292(a).

## Statement of Issues

1.      Whether the district court erred by holding Plaintiffs had standing to challenge Act 573 (a law requiring historical representations of the Ten Commandments, if donated, to be displayed) when they did not know what a display and its context would look like or show that any donation had occurred or was certainly impending when they filed suit.

Apposite Authority: *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024); *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015 (8th Cir. 2012).

2.      Whether the district court erred by allowing Plaintiffs to add parties to the suit and altering a pending appeal's status.

Apposite Authority: *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023); *State ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102 (8th Cir. 1999); *Wooten v. Roach*, 964 F.3d 395 (5th Cir. 2020).

3.    Whether the district court erred by concluding Act 573 violates the Establishment Clause based on purportedly improper legislative purpose, an expert's legal opinion, and overruled precedent.

Apposite Authority:  *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022); *Town of Greece v. Galloway*, 572 U.S. 565 (2014);  *New Doe Child #1 v. United States*, 901 F.3d 1015 (8th Cir. 2018); *ACLU Nebraska Found. v. City of Plattsmouth*, 419 F.3d 772 (8th Cir. 2005).

4.    Whether the district court erred by concluding passive, historical displays of the Ten Commandments violate free-exercise rights.

Apposite Authority: *Mahmoud v. Taylor*, 606 U.S. 522 (2025); *B.W.C. v. Williams*, 990 F.3d 614 (8th Cir. 2021); *New Doe Child #1 v. United States*, 901 F.3d 1015 (8th Cir. 2018).

5.    Whether the district court erred by failing to apply the rigorous standard applicable to facial challenges.

Apposite Authority: *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024); *Croft v. Perry*, 624 F.3d 157 (5th Cir. 2010).

6.     Whether the district court erred by presuming Plaintiffs satisfied other preliminary-injunction factors and by granting injunctive relief that extended to schools and classrooms that Plaintiffs do not attend and will never enter.

Apposite Authority: *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

## STATEMENT OF THE CASE

### A. After the Arkansas Legislature passed Act 573, Plaintiffs sought pre-enforcement injunctive relief against four school districts.

In 2025, the Arkansas Legislature enacted Act 573, which provides for "a historical representation of the Ten Commandments" to be posted in public-school classrooms and libraries if funds are donated for that purpose or a display is donated. Ark. Code Ann. § 1-4-133(a)(1)(B)(i)-(ii), (b).  Act 573 requires that the donated display be "at least sixteen inches by twenty inches" with text "legible to a person with average vision," and that it be placed "in a conspicuous place."  *Id.* § 1-4-133(a)(1), (a)(1)(B)(ii)(a)-(b).

The Act further instructs that the "historical representation" must include the following text:

> The Ten Commandments
> I am the Lord thy God.
> Thou shalt have no other gods before me.
> Thou shalt not make to thyself any graven images.
> Thou shalt not take the Name of the Lord thy God in vain.
> Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the
land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his
maidservant, nor his cattle, nor anything that is thy neighbor's.

*Id.* § 1-4-133(a)(1)(B)(ii), (iii).  This text is nearly identical to the text on the Ten

Commandments monument in *Van Orden v. Perry*, 545 U.S. 677, 707 (2005) (Stevens,

J., dissenting) (quoting text), which was crafted by "a committee composed of

members of several faiths" "to find a nonsectarian text," *id.* at 701 (Breyer, J.,

concurring in judgment), and upheld as constitutional, *id.* at 703; *see id.* at 692

(plurality).

Before the Act's effective date, parents sued four school districts on behalf of

themselves and 14 students in those districts.  App. 44-46; R. Doc. 2, at 4-6.  Plaintiffs

alleged Act 573's implementation would violate the Establishment Clause and free-

exercise rights.  App. 71-74; R. Doc. 2, at 31-34.  They did not allege they had seen an

Act 573 display, any displays had been donated, or any funds had been donated to

purchase displays for their classrooms.  Nevertheless, Plaintiffs filed a preliminary-

injunction motion, requesting Defendants be enjoined from displaying the Ten Commandments in any classroom or library.  App. 77-80; R. Doc. 8, at 1-4.

Plaintiffs argued they would likely succeed on their Establishment Clause claim because Act 573 is "constitutionally forbidden" under *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), and because posting Ten Commandments displays in classrooms is unconstitutionally coercive, impermissibly favors one religious denomination, and lacks historical support based on an expert report by Steven Green. R. Doc. 9, at 8-23. Plaintiffs also argued they would succeed on their free-exercise claim because displays would be coercive to student-Plaintiffs, burden parent-Plaintiffs' right to guide their children's upbringing, and cannot satisfy strict scrutiny. *Id*. at 24-29.  Regarding the remaining preliminary-injunction factors, Plaintiffs argued that future loss of First Amendment rights was irreparable and avoiding constitutional deprivations is in the public interest.  *Id*. at 29-30.

### B.  Arkansas intervened to defend Act 573.

Arkansas intervened to defend the constitutionality of its democratically enacted law, R. Doc. 39, and filed a combined motion to dismiss and preliminary-injunction opposition, R. Doc. 53.  Arkansas argued Plaintiffs lacked standing to assert their claims, which were also unripe. R. Doc. 53, at 6-17.  Arkansas explained Plaintiffs' alleged injury was not certainly impending because Defendants had not

received any donations for a display and that any injury was speculative because Plaintiffs had not seen any displays and their contexts, so they could not know whether a hypothetical future display would harm them. *Id.* at 6-14.

As to the merits, Arkansas argued Plaintiffs relied on abrogated precedent and explained that the Ten Commandments have historical significance, played an important role in "America's heritage," *Van Orden*, 545 U.S. at 689 (plurality), and are "one of the foundations of our legal system." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 53 (2019). R. Doc. 53, at 1, 8, 17-26. Citing history and caselaw, Arkansas argued Plaintiffs failed to show Act 573's requirement that schools post a "historical representation of the Ten Commandments"—using text recognized as nonsectarian by both the Supreme Court and Eighth Circuit—has any hallmark of religious establishments or that Act 573 displays would be coercive. *Id.* at 24-34. Regarding Plaintiffs' free-exercise claims, Arkansas argued that the Act was neutral and generally applicable and a passive, historical display would not burden religious exercise as it would not require anyone to engage in a religious practice nor prevent them from doing so. *Id.* at 34-35. Arkansas also argued that Plaintiffs failed to show a substantial interference with parent-Plaintiffs' rights under *Mahmoud v. Taylor*, 606 U.S. 522 (2025), and couldn't do so. *Id.* at 35-37.

Arkansas further explained Plaintiffs failed to establish the remaining preliminary-injunction factors, including because alleged harms were not imminent, and an injunction would prevent a validly enacted law from being constitutionally implemented. *Id.* at 38-40. Finally, Arkansas argued the court lacked authority to grant an injunction extending to classrooms and libraries that student-Plaintiffs would never enter. *Id.* at 40-42.

Contemporaneously with its preliminary-injunction opposition and motion to dismiss, Arkansas moved to exclude Plaintiffs' expert. App. 174; R. Doc. 54. Arkansas detailed how Green offered unreliable and irrelevant opinions, including because he improperly opined on legal issues and offered opinions contradicting Supreme Court precedent. R. Doc. 55, at 1-9.

### C. The district court denied Arkansas's motions to dismiss and exclude Plaintiffs' expert and issued a broad preliminary injunction.

On July 17, 2025, the district court denied Arkansas's motion to exclude, concluding Green was a qualified expert in "law," as well as religion and history. App. 363; R. Doc. 64, at 3. The next day the district court held a hearing on the preliminary-injunction motion and motions to dismiss. R. Doc. 66.

On August 4, 2025, the district court denied the motions to dismiss and granted the preliminary-injunction motion. Overlooking differences between standing and ripeness, the district court first concluded Plaintiffs had standing and

ripe claims because displays were donated a few days before it issued its opinion. Add. 17; App. 400; R. Doc. 71, at 17.  It further concluded the unknown context of the displays was irrelevant because Act 573's minimum requirements would harm Plaintiffs and a display is "not merely passive." Add.19-24; App. 402-07; R. Doc. 71, at 19-24.[1]

Turning to the merits, the district court concluded that the "case begins and ends with *Stone*" and the legislature had an impermissible religious purpose in passing the Act.  Add. 25-26; App. 408-09; R. Doc. 71, at 25-26.  Alternatively, it concluded the Act violates the Establishment Clause under the historical-practices-and-understanding test, relying on Green's testimony.  Add. 26-31; App. 409-14; R. Doc. 71, at 26-31.

---

[1] The district court also suggested counsel agreed that "adding a drawing of Moses holding the Ten Commandments" was the type of historical context to which the Act refers, which could not mitigate Plaintiffs' alleged injury. Add. 19; App. 402; R. Doc. 71, at 19.  But when responding to hypotheticals, counsel simply acknowledged that "individuals who choose to donate such displays" could add a host of different elements to displays, underscoring the speculative nature of Plaintiffs' claims and injuries, App. 800-04 (189:6-193:20).  And at the hearing, the court understood Arkansas's argument that Act 573 "acknowledge[s] the historical significance of the document to *our nation's* history and legal system and education," App. 625 (14:21-24) (emphasis added), and that Act 573 displays could be surrounded with "other documents of civic significance such as the Bill of Rights or the Magna Carta," App. 809 (198:14-20).

The district court also concluded the Act likely violates free-exercise rights. Add. 32; App. 415; R. Doc. 71, at 32. It reasoned a display would "likely interfere with and usurp" the parent-Plaintiffs' right to guide the religious upbringing of their children, "send an exclusionary and spiritually burdensome message to the child-Plaintiffs," and "likely pressure the child-Plaintiffs into religious observance." *Id.*

The district court then "presum[ed]" that the "remaining preliminary injunction factors" "weigh[ed] in [Plaintiffs'] favor." Add. 33; App. 416; R. Doc. 71, at 33. It reasoned that a First Amendment violation is irreparable harm and that Defendants and Arkansas would not "suffer any harm" from a preliminary injunction. *Id.* Finally, while the district court acknowledged there was no evidence that child-Plaintiffs participate in extracurriculars requiring them to enter other classrooms and schools, it still issued an injunction extending to every classroom and school within Defendants' school districts. Add. 34; App. 416; R. Doc. 71, at 34.

### D. After Arkansas appealed, the district court allowed Plaintiffs to repeatedly modify their complaint and issued additional injunctions.

After Arkansas filed an interlocutory appeal, R. Doc. 78, Plaintiffs filed a motion for leave to amend their complaint, App. 419; R. Doc. 79. Plaintiffs argued that every district in Arkansas—even non-parties—should have abided by the preliminary-injunction opinion and that Plaintiffs should be allowed to amend their complaint to add additional plaintiffs because Conway School District posted Ten

Commandments displays.  App. 419-22; R. Doc. 79, at 1-4.  Plaintiffs also requested that Arkansas be compelled to file any response within a single business day, R. Doc. 80, at 2, which the district court granted over Arkansas's objections, R. Doc. 81; R. Doc. 83.  In response, Arkansas argued, among other things, that the district court lacked authority to consider the motion because the pending appeal of the preliminary-injunction order and intertwined motion-to-dismiss denial divested it of jurisdiction over aspects of the case involved in the appeal.  R. Doc. 84, at 1-2.

After classifying Plaintiffs' motion to amend as a motion to supplement, the district court granted it.  App. 425-26; R. Doc. 86, at 1-2.  Plaintiffs then moved for a temporary restraining order and preliminary injunction against the newly added Defendant.  App. 479; R. Doc. 90.  The district court granted the TRO and requested briefing as to why it should not be converted into a preliminary injunction.  R. Doc. 93.  Arkansas argued that added-Plaintiffs failed to establish any preliminary-injunction factor and the district court lacked authority to grant an overbroad injunction.  R. Doc. 107, at 1-7. The district court disagreed and enjoined Conway from enforcing the Act in any school classroom. App. 520-22; R. Doc. 111.

About a month later, Plaintiffs moved for leave to supplement the complaint to add more plaintiffs and another school-district defendant after Lakeside School District posted some Act 573 displays in classrooms. App. 526-27; R. Doc. 123, at 4-

5.  Arkansas opposed, arguing, among other things, that allowing supplementation would further complicate the appeal and exacerbate the ongoing prejudice Arkansas suffered due to the district court's *sua sponte* order expediting the case. *See* R. Doc. 127, at 3-6; *see also* R. Doc. 122 (denying unopposed one-month extension motion and a motion to stay proceedings); R. Docs. 114-116.  The district court granted Plaintiffs' motion to supplement, concluding "the only difference" between Plaintiffs' and proposed-Plaintiffs' claims was the time of accrual.  App. 531; R. Doc. 130, at 2.

Plaintiffs filed another TRO and preliminary-injunction motion. R. Doc. 133. The district court granted the TRO and requested briefing on why the "preliminary injunction should not be modified to include" Defendant Lakeside.  R. Doc. 137, at 3.  Arkansas argued the district court lacked "authority to modify the earlier preliminary injunctions," added-Plaintiffs had not established any preliminary-injunction factors, and the district court lacked authority to issue an injunction that extended beyond added-student-Plaintiff's classrooms.  R. Doc. 145, at 3-7.  The district court nevertheless issued a preliminary injunction prohibiting Lakeside from posting Ten Commandment displays in any classroom in the entire district. App. 611; R. Doc. 149, at 2.  Arkansas once again appealed, R. Doc. 153, and this Court consolidated the third appeal with the earlier two, R. Doc. 155.

## Summary of the Argument

The district court never should have issued the initial preliminary injunction because Plaintiffs lacked standing and ripe claims. When Plaintiffs filed suit, they had never seen an Act 573 display, did not know when or if they would see one, and had no idea what a display or its surrounding context may look like. In other words, their asserted injury was presumed future offense and coercion caused by a hypothetical, future Ten Commandments display. That is insufficient to satisfy Article III, so the district court should have dismissed the case rather than issuing a preliminary injunction. That added-Plaintiffs saw a Ten Commandments display before being added to the suit does not remedy the original jurisdictional defects.

The district court also erred in concluding that Plaintiffs established likelihood of success. Regarding their Establishment Clause claims, Plaintiffs failed to show that Act 573 bears any hallmark of a religious establishment. That is because having a non-sectarian Ten Commandments display is consistent with historical practices and understandings. In concluding otherwise, the district court relied on abrogated precedent, misapplied current precedent, and deferred to an expert's opinion regarding the First Amendment that is contradicted by the historical record and binding Supreme Court precedent.

The district court's free-exercise analysis was no better. A passive Ten Commandments display on a wall does not impose a substantial burden on free-exercise rights. It does not prevent Plaintiffs from doing anything required by their beliefs, nor does it obligate Plaintiffs to do anything prohibited by their beliefs. And this case could not be further afield from *Mahmoud*. A Ten Commandments poster hanging on a wall involves none of the same coercion concerns as curricular books that expressed hostility towards religious views and instructions directing teachers to "reprimand any children who disagree" with the books' viewpoint. 606 U.S. at 556.

To top it off, the district court failed to apply the rigorous standard that applies to facial challenges, did not properly balance the harms and equities, and granted an overbroad injunction, exceeding its authority. This Court should reverse.

## ARGUMENT

### I. STANDARD OF REVIEW

Generally, this Court reviews preliminary-injunction decisions under an abuse-of-discretion standard; however, "[w]hen purely legal questions are presented," it gives "no special deference to the district court" and reviews "legal conclusions de novo." *Powell v. Noble*, 798 F.3d 690, 697 & n.1 (8th Cir. 2015). Plaintiffs must make a "clear showing" to be entitled to "extraordinary" relief and

establish likelihood of success, irreparable harm absent preliminary relief, "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20, 22 (2008); *see Bio Gen LLC v. Sanders*, 142 F.4th 591, 600 (8th Cir. 2025) (noting a heightened showing to enjoin implementation of a state statute); *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022) (same). When a State opposes an injunction, "the balance-of-harms and public-interest factors merge." *Id.* at 564-65.

## II. PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE.

### A. Hypothetical offended-observer standing does not satisfy Article III.

Even assuming offended-observer precedent remains good law,[2] original-Plaintiffs failed to establish standing. That is because they had not encountered any Act 573 display, did not show an encounter was certainly impending, and did not know what a display and its surrounding context would look like when they sued.

In *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015 (8th Cir. 2012), this Court held plaintiffs challenging a Ten Commandments display must have a "direct and unwelcome personal contact" with the display to have standing. *Id.* at 1023; *see*

---

[2] Arkansas preserves the argument that this Court's offended-observer standing precedent should be overruled because it "has no more foundation in the law than the *Lemon* test that inspired it." *City of Ocala v. Rojas*, 143 S. Ct. 764, 765 (2023) (Gorsuch, J., concurring from cert denial); *see Am. Legion*, 588 U.S. at 84 (Gorsuch, J., concurring).

*ACLU-NJ v. Twp. of Wall*, 246 F.3d 258, 266 (3d Cir. 2001) (Alito, J.); *Barber v. Bryant*, 860 F.3d 345, 353-54 (5th Cir. 2017). Original-Plaintiffs did not make this showing. Because there was no Act 573 display donated or in any classroom, much less in student-Plaintiffs' classrooms when original-Plaintiffs filed suit, there had been no direct or unwelcome personal contact with a display. Any future contact was not certainly impending—and it was speculative that a display and its context would burden free-exercise rights.

After all, Act 573 displays would only be posted "[i]f funds" are available for the displays "through voluntary contributions" or if displays are "donated," Ark. Code Ann. § 1-4-133(a)(1), (b), and at the preliminary-injunction hearing, original-Plaintiffs could point only to fundraising efforts that appear to post-date the complaint's filing and were not targeted towards Defendants' schools. *See* R. Doc. 58-1, at 2-3; App. 179-80.[3] Moreover, Defendants submitted declarations attesting that they had not received any donations and did not "presently intend to display the Ten Commandments." R. Doc. 49, at 4-15. Original-Plaintiffs' alleged injuries thus

---

[3] Just days before the preliminary injunction issued, Plaintiffs notified the court that a July 29 Facebook post indicated one church by a school district near Fayetteville was fundraising, and that displays were donated to *one* Defendant, App. 366-67; R. Doc. 69, at 1-2; R. Doc. 70, at 1. But that does not mean original-Plaintiffs showed a sufficiently imminent or concrete injury existed at the time the suit commenced, particularly related to other Defendants. *See Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009)("general allegations of *possible* or *potential* injury" insufficient).

"rest[ed] on speculation about the decisions of independent actors," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), which is insufficient for standing.

Indeed, original-Plaintiffs' alleged injuries rested on multiple guesses—that a donation was certainly impending and that the hypothetical future display and its context would lead their children to feel coerced. But the law requires "a historical representation of the Ten Commandments" potentially alongside the national motto and the United States and Arkansas flags. Ark. Code Ann. § 1-4-133(a)(1). This indicates donated displays could include historical context about how the Ten Commandments are "one of the foundations of our legal system," *Am. Legion*, 588 U.S. at 53, and play a role "in America's heritage," *Van Orden*, 545 U.S. at 689 (plurality). And the law does not require that Act 573 displays be the *only* item on classroom walls, so the displays would likely be surrounded by other documents that have historical significance or by countless things that could alter one's feelings about a display.[4] *See id.* at 701-02 (Breyer, J., concurring) ("the Ten Commandments can send different messages in different contexts").

---

[4] *See also* D. Arkin and E. Ortiz, *How some Texas teachers are fighting the Ten Commandments law in classrooms*, NBC News (Sept. 14, 2025), https://tinyurl.com/3ctny3p6; *H.B. 71 Guidance for Louisiana Schools*, https://tinyurl.com/45u2pvbm; App. 268; R. Doc. 58-1, at 91.

Given the uncertainty that existed, original-Plaintiffs' alleged worries about future pressure to venerate the Ten Commandments were "abstract," conjectural, and hypothetical—not "actual or imminent" injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016). Their alleged injury from a potential future encounter with a poster is nothing like the concrete injury in *Mahmoud* where the challenged policy had already been implemented and there was "little mystery" as to the content of the curricular instruction when the suit was filed. *See* 606 U.S. at 537, 554.

In short, original-Plaintiffs' "general legal, moral, ideological, or policy objection" to Act 573 does not satisfy Article III's injury-in-fact requirement. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). This Court should decline to extend offended-observer standing to a new context—hypothetical future offense—and instead conclude Plaintiffs lacked standing when the complaint was filed.

## B. Later-added parties do not cure the original jurisdictional defect.

Later-added parties and supplemental pleadings do not remedy the original jurisdictional defects. As the Supreme Court has reiterated, "[a]n appeal, including an interlocutory appeal, 'divests the district court of its control over those aspects of the case involved in the appeal.'" *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)). Because Arkansas appealed from the preliminary injunction and the intertwined motion-to-

dismiss denial, the district court lacked jurisdiction to consider Plaintiffs' motion to amend. *See* A. Ides, *The Authority of a Federal District Court to Proceed After a Notice of Appeal Has Been Filed*, 143 F.R.D. 307, 308 (1992) ("once a notice of appeal has been filed, a district court may not grant leave to amend a complaint"); *Wooten v. Roach*, 964 F.3d 395, 403 (5th Cir. 2020) ("the district court exceeded its jurisdiction by accepting [the] second amended complaint"). Nor could the district court sidestep its lack of jurisdiction by denying the motion to amend but allowing Plaintiffs to supplement the complaint (twice). After all, those orders still impermissibly "altered the status" of this appeal in at least two ways. *In re Fort Worth Chamber of Com.*, 100 F.4th 528, 537 (5th Cir. 2024) (citation modified).

First, the orders potentially impacted the standing issue. Although this Court has (rightly) held that "standing is determined as of the lawsuit's commencement" and facts are considered "as they existed at that time," *Harley v. Zoesch*, 413 F.3d 866, 872 (8th Cir. 2005), other circuits have held that plaintiffs may amend or supplement pleadings to "alleg[e] facts that arose after filing the complaint" to cure a standing defect, *Scahill v. Dist. of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018). Plaintiffs ultimately decided to waive an argument that an amended or supplemental complaint "affect[s] the original Plaintiffs' standing as of the time of filing," R. Doc. 85, at 6, but the initial "doubt" about whether ruling on the motion would affect a matter on

18

appeal should have caused the district court to "stay its hand," *State v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999).

Second, the district court's orders have, as a factual matter, altered the appeal's status. They necessitated two additional appeals, which this Court consolidated, and complicated the legal issues and altered briefing deadlines. By issuing orders "that altered the status of the appeal," "the district court wrongfully asserted jurisdiction over 'aspects of the case involved in [this] appeal.'" *Wooten*, 964 at 404 (quoting *Griggs*, 459 U.S. at 58). As such, those orders are "void," *Coeur D'Alene Tribe*, 164 F.3d at 1107, so later-added Plaintiffs and Defendants are not proper parties, and the district court lacked authority to issue preliminary injunctions related to them.

In any event, the district court could not grant Plaintiffs leave to supplement the complaint to add new parties because, as explained above, original-Plaintiffs lacked standing. Whether through supplementation or intervention, new parties cannot be added to remedy lack of jurisdiction at a suit's commencement. *See Mattice v. Meyer*, 353 F.2d 316, 319 (8th Cir. 1965) (concluding "there was no basis for intervention" when plaintiff "lacked standing at law"); *Pressroom Unions-Printers League Income Sec. Fund v. Con't Assur. Co.*, 700 F.2d 889, 893 (2d Cir. 1983) ("[I]f jurisdiction is lacking at the commencement of [a] suit, it cannot be aided by

the intervention of a [plaintiff] with a sufficient claim."); *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 453 (5th Cir. 1995) ("Rule 15 does not permit a plaintiff [to] amend[] its complaint to substitute a new plaintiff in order to cure the lack of subject matter jurisdiction."). That means original-Plaintiffs' lack of standing is fatal to added-Plaintiffs' claims too (or, at the very least, the injunctions must be narrowed, *infra* 57-58).[5]

## III. PLAINTIFFS FAILED TO SHOW LIKELY SUCCESS.

The merits provide another basis to reverse. The district court concluded Plaintiffs would likely succeed on their Establishment Clause claim by repeatedly overlooking Arkansas's arguments and evidence,[6] applying abrogated Supreme Court precedent, and concluding a few legislators' statements demonstrated "the

---

[5] If the court had "discretion to treat those pleadings as a separate action," Wright & Miller, Fed. Prac. & Proc. § 1917, it should have dismissed or transferred for improper venue given the first-added parties reside in a different judicial district, R. Doc. 99-1, at 6. *See Miller v. Albright*, 523 U.S. 420, 426-27 (1998) (op. of Stevens, J.) (district court dismissed plaintiff who resided in the district for lack of standing, making venue improper and necessitating transfer); 28 U.S.C. § 1391(b).

[6] For example, the district court claimed Arkansas provided no support for its argument the text is non-sectarian—despite multiple citations in Arkansas's brief, R. Doc. 53, at 3, 24-25, a colloquy with counsel about that exact argument, App. 804-08 (193:24-197:4), and an amicus brief on the issue, R. Doc. 57-1, at 35-39—and claimed Arkansas used the term non-sectarian to "mean 'generally unobjectionable,'" Add. 28; App. 411; R. Doc. 71, at 28, even though that was not said in briefing or at argument, *see generally* App. 612-904; R. Doc. 53.

Arkansas General Assembly's purpose" in enacting Act 573 was religious. Add. 26; App. 409; R. Doc. 71, at 26. But *Lemon* is dead, and under *Galloway* and *Kennedy*, Act 573 lacks any hallmark of religious establishment, so Plaintiffs are unlikely to succeed on their establishment claims. Plaintiffs are likewise unlikely to succeed on their free-exercise claims. They failed to show that Act 573 is not neutral or generally applicable or to show it substantially burdens free exercise to warrant strict scrutiny. And Plaintiffs certainly failed to show they could likely satisfy the rigorous standard that applies to their facial challenges.

## A. Plaintiffs' establishment claim fails.

### 1. Stone *is not binding.*

*Stone* is effectively dead and does not bind this Court here. The district court concluded otherwise, reasoning that "*Kennedy* does not alter the reasoning or outcome of *Stone*" and that "*Stone* explains" that "posting the Ten Commandments on a classroom wall 'serves no … educational function.'" Add. 25; App. 408; R. Doc. 71, at 25. But *Stone* did not hold that Ten Commandments displays in classrooms are always unconstitutional. *Stone* recognized that the Ten Commandments, along with the Bible and other religious texts, could be in public schools in some circumstances. 449 U.S. at 42. It simply held that "*Kentucky's* statute requiring the posting of the Ten Commandments in public schoolrooms had no secular legislative purpose, and

is therefore unconstitutional" under "the first part of the *Lemon v. Kurtzman*, test." *Id*. at 41, 43 (emphasis added).  The Supreme Court did not hold that a public school could *never* have a Ten Commandments display, that other States' different laws would necessarily be unconstitutional, or that a Ten Commandments display could *never* serve a secular purpose.  *See, e.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 593-94 (1987) (*Stone* does "not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization").  And to the extent *Stone* suggested that the Ten Commandments could not have a secular purpose because they are "a sacred text," 449 U.S. at 41, the Supreme Court has clarified the Ten Commandments, along with practices and other displays with religious significance, can serve secular purposes too.

Since issuing *Stone*, the Supreme Court has narrowed *Stone*'s holding, held that not all religious acknowledgments must be purged from public spheres, and repudiated the test that *Stone* explicitly applied: the *Lemon* test.  For example, in *Marsh v. Chambers*, the Supreme Court held that opening legislative sessions with prayers ("by a chaplain paid by the State") did not run afoul of the Establishment Clause, recognizing that prayers could serve the secular purpose of acknowledging "beliefs widely held among the people of this country."   463 U.S. 783, 784, 792

(1983).  And the following year, the Supreme Court concluded that a city had "legitimate secular purposes" for displaying a nativity scene—namely, "to celebrate the Holiday and to depict the origins of that Holiday."  *Lynch v. Donnelly*, 465 U.S. 668, 681 (1984).  The Supreme Court explained that the *Stone* display was only a "religious admonition" and "motivated *wholly* by religious considerations."  *Id.* at 679-80 (emphasis added).  With this narrowing, it logically follows that a Ten Commandments display that serves secular, as well as religious, purposes would create no Establishment Clause problem even before *Lemon*'s demise.  And this reasoning was borne out in *McCreary County*.

In *McCreary County*, the Supreme Court applied *Lemon* and affirmed a preliminary injunction requiring a specific Ten Commandments display to be removed based on the religious purpose underlying the action there.  545 U.S. at 861-64, 881.  But the Supreme Court expressly did not hold that counties' past actions would "forever taint" future actions or that "a sacred text" can never be in a government display.  *Id.* at 873-74.

The same day *McCreary County* was decided, the Supreme Court decided *Van Orden*, upholding the constitutionality of a display on Texas's Capitol grounds.  545 U.S. at 681 (plurality).  Neither the plurality nor Justice Breyer's concurrence relied on *Lemon*.  *See id.* at 686; *id.* at 703-04 (Breyer, J., concurring).  Instead, the plurality

explained, "[a]cknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America," including in the Supreme Court building, other federal buildings, and court opinions. *Id.* at 688-89. The plurality reasoned that this "rich American tradition of religious acknowledgements" illustrates that "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Id.* at 690. Justice Breyer also recognized America's history of public acknowledgments of religion and references to God. *See id.* at 699 (Breyer, J., concurring).

In subsequent decades, the Supreme Court's establishment jurisprudence repeatedly assessed the constitutionality of a practice or display based on historical practices, not the *Lemon* test. *See Galloway*, 572 U.S. at 577; *Am. Legion*, 588 U.S. at 49-52 (plurality). And the Supreme Court reiterated its conclusion that the Ten Commandments "have historical significance as one of the foundations of our legal system," public depictions of which "serve secular purposes." *Am. Legion*, 588 U.S. at 53; *see id.* at 60. Accordingly, since *Stone*, the Supreme Court narrowed *Stone* and gradually abandoned the *Lemon* test on which it relied.

The Supreme Court's overruling of the *Lemon* test and its progeny is now undisputed. *See Groff v. DeJoy*, 600 U.S. 447, 460 & n.7 (2023) (acknowledging

*Lemon* was "abrogated" and citing *Kennedy*); *Firewalker-Fields v. Lee*, 58 F.4th 104, 121 n.5 (4th Cir. 2023) ("*Lemon* and its ilk are not good law."). In *Kennedy*, the Supreme Court criticized the district court and Ninth Circuit for "overlook[ing] … that th[e Supreme] Court long ago abandoned *Lemon* and its endorsement test offshoot." 597 U.S. at 534. It concluded that the lower courts "erred by failing to heed" guidance in cases like *Galloway* and *American Legion* that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.' " *Id*. at 535-36. Although *Galloway* and *American Legion* involved legislative prayer and a monument on government land, the Court nonetheless cited these cases as the guidance that the lower courts erroneously overlooked. *Kennedy*, 597 U.S. at 534.

This Court should not make a similar mistake. *Stone* is part of the *Lemon* progeny that *Kennedy* overruled because it undisputedly relied on *Lemon*. *See Stone*, 449 U.S. at 42-43 ("conclud[ing] that [the Kentucky law] violates the first part of the *Lemon v. Kurtzman*, test"). It did not rely on any other test to assess the constitutionality of the displays at issue. So by applying *Stone*, the district court impermissibly applied *Lemon*—it concluded that Act 573 violated the Establishment Clause because it assumed the Arkansas Legislature had a religious purpose and cited

legislative comments quoted in Plaintiffs' complaint.  Add. 25-26; App. 408-09; R. Doc. 71, at 25-26.[7]

To be sure, the Supreme Court has "the prerogative of overruling its own decisions," and lower courts should apply a *directly* controlling case even when it "*appears* to rest on reasons rejected in some *other* line of decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (emphases added).  But here *Stone* does not simply "appear" to rest on rejected reasons—it expressly relied on *Lemon*, which has been expressly overruled, and *Lemon*, *Stone*, and *Kennedy* are in the *same* line of cases.  And in *Kennedy* itself, the Supreme Court faulted the lower courts for failing to heed its guidance even though it had not yet explicitly overruled *Lemon*.  *See* 597 U.S. at 534; *id*. at 572 (Sotomayor, J., dissenting).  Moreover, as this Court recognized even before *Kennedy*, a "historical approach" to the Establishment Clause "is not limited to a particular factual context."  *New Doe Child #1 v. United States*, 901 F.3d 1015, 1020 (8th Cir. 2018).  The district court thus erred by concluding that *Stone* remains binding.

---

[7] A vacated Fifth Circuit opinion similarly demonstrates that courts cannot apply *Stone* without applying *Lemon*'s purpose test. *See Roake v. Brumley*, 141 F.4th 614, 643-45 (5th Cir.), *vacated by*, 154 F.4th 329 (5th Cir. 2025).

### *2. Even if* **Stone** *remained good law, it cannot be applied here.*

Regardless, even if the district court were correct that *Stone* is binding, because *Stone* relies on abrogated precedent, it should not be extended to different circumstances as the district court did here. *See Van Orden,* 545 U.S. at 701 (Breyer, J., concurring) (determining message conveyed "requires us to consider the context"); *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1019 (9th Cir. 2010) ("[C]ontext is determinative.").

As Plaintiffs themselves acknowledged below, "[*u*]*nlike in Stone*, Arkansas lawmakers" set forth the specific Ten Commandments text that must be included in the display. R. Doc. 9, at 10 (emphasis added). The legislature chose to use a text that is nearly identical to the text that was approved in *Van Orden* and in *City of Plattsmouth. Compare Van Orden*, 545 U.S. at 707 (Stevens, J., dissenting), *and ACLU Nebraska Found. v. City of Plattsmouth*, 186 F.Supp.2d 1024, 1028 (D. Neb. 2002), *rev'd* 419 F.3d 772 (en banc), *with* Ark. Code Ann. § 1-4-133(a)(1)(B)(iii). That text is nonsectarian. *See Van Orden*, 545 U.S. at 701 (Breyer, J., concurring) (noting that the text of the monument was selected "with a committee composed of members of several faiths in order to find a nonsectarian text"); *City of Plattsmouth*, 419 F.3d at 773 & n.2 (recognizing the "nonsectarian" nature of text).

The district court rejected this precedent, concluding the text was "derived from the King James Bible" and "sect-specific" (Protestant) based on Green's testimony, and that Act 573 mandates "the display of expressly religious scripture." Add. 28, 31; App. 411, 414; R. Doc. 71, at 28, 31. Even if the district court could override this Court's precedent, its conclusion is wrong. As an amicus explained, the text selected is not a Protestant version and is not derived exclusively from any one translation. *See* R. Doc. 57-1, at 35-38. The district court wrongly refused to consider the amicus brief "for evidentiary purposes" based on a *dissenting* Supreme Court opinion that criticized the *majority* for relying on amici filings. Add. 27; App. 410; R. Doc. 71, at 27 (citing *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 642 n.11 (2021), without noting it was the dissent). Courts, however, can and do rely on amicus briefs by historians and on scholarly articles. *See, e.g.*, *Ramirez v. Collier*, 595 U.S. 411, 425 (2022); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022); *United States v. Jackson*, 110 F.4th 1120, 1126 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 2708 (2025). And Arkansas not only relied on historical evidence, amicus, and binding caselaw, it also pointed to legislative testimony that the district court ignored. *See* R. Doc. 53, at 29-32; App. 806 (955:14-22); App. 852-57 (241:11-246:17); *see also* App. 194 (referring to the proposed amicus brief (R. Doc. 57-1, at 12)); R. Doc. 67 (granting leave to file amicus brief); Gov't Aff. Comm. Hr'g, at 12:34:30-36:08 (Apr.

2, 2025), https://tinyurl.com/mr28c3za (testimony from a pastor opposing Act 573, who described the text as "a cobbled together version" and read from portions of "[her] Protestant Bible" that did not match the Act's text).

Thus, contrary to the district court's opinion, the Arkansas Legislature chose a nonsectarian text, unaligned with any one faith tradition. That choice further shows the legislature intended to recognize the historical significance of the Ten Commandments, not proselytize. The legislature also deviated from the text in *Van Orden* in one respect—it omitted some capitalization that could be viewed as highlighting the text's religious aspects. *See Van Orden*, 545 U.S. at 739 (O'Connor, J., dissenting) (criticizing the use of "all capital letters," which made the phrase "I AM the LORD thy God" the "most eye-catching segment" in Texas's monument). Moreover, Act 573 requires a "historical representation" further reflecting the purpose of the statute, Ark. Code Ann. § 1-4-133(a)(1)(B)(i)—to acknowledge the Ten Commandments' historical importance.

The statute's text makes this case distinguishable from *Stone*. So too do the facts. Despite Plaintiffs' cherry-picked comments from the legislative testimony, the hearings corroborate the Act's secular purpose of acknowledging the historical significance of the Ten Commandments to our Nation's history, legal system, and

education.[8]  And even under *Lemon*'s purpose prong, "what is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law."  *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 249 (1990) (plurality).

Finally, in *Stone*, the Supreme Court knew what the Ten Commandments displays would look like because thousands had been posted.  *See Stone*, 599 S.W.2d at 159.  In this case, the district court did not know what the displays and surroundings in original-Plaintiffs' classrooms would look like.  And while the added-Plaintiffs provided pictures of three displays in student-Plaintiffs' classrooms, the pictures excluded nearly all context.  *See* App. 551-554; R. Doc. 131, at 18-21.

Given these differences, *Stone* is not on all fours.  The district court therefore erred by extending *Stone*'s flawed reasoning and repudiated test.  *See Hester v. United*

---

[8]  *See, e.g.*, S. State Agencies Hr'g, 11:22:50-24:44 (Mar. 18, 2025), https://tinyurl.com/4xj98ad2 (discussing history of American schools, the Ten Commandment's historical and legal significance, and noting the Ten Commandments were on display and part of curriculum in Arkansas schools until the 1980s); S. Hr'g at 3:45:55-48:10 (Mar. 19, 2025), https://tinyurl.com/ydtvfaz9 (explaining "this is not about religion" and "the Ten Commandments are widely recognized as the foundation of Western law," which is why they are displayed in the Supreme Court); *id.* at 3:56:20-57:25 (explaining the law is "about a historical representation of the Ten Commandments," they are "one of the foundations of Western law," and they have historically been used in public education); App. 757-59 (146:21-148:18), App. 810-11 (199:24-200:4) (historical textbooks incorporating the Ten Commandments in various ways were discussed "in the legislative debates at the Arkansas assembly").

*States*, 586 U.S. 1104, 1105 (2019) (Alito, J., concurring in certiorari denial) ("suspect precedents" should not be extended).

### 3. *Act 573 has no hallmark of religious establishment.*

In the alternative, the district court purported to apply the historical-practices-and-understanding test. Its analysis, however, boiled down to uncritical acceptance of Green's views about the beliefs of two Founders (Thomas Jefferson and James Madison) regarding the Establishment Clause's meaning, a determination that use of the Ten Commandments in public education was not widespread enough, including because there were not permanent Ten Commandment displays in all public-school classrooms, and an assumption that a passive display is necessarily coercive. Add. 28-31; App. 411-414; R. Doc. 71, at 28-31. But that is both a misunderstanding and misapplication of the relevant test.

Under the historical framework, the relevant question is whether Act 573 implicates the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 537; *see Galloway*, 572 U.S. at 576 ("[T]he Establishment Clause must be interpreted by reference to historical practices and understandings." (quotation omitted)); *accord New Doe Child*, 901 F.3d at 1020 & n.6. Those hallmarks are whether the government (1) "exerted control over the doctrine and personnel of the established church," (2) "mandated

attendance in the established church and punished people for failing to participate," (3) "punished dissenting churches and individuals for their religious exercise," (4) "restricted political participation by dissenters," (5) "provided financial support for the established church, often in a way that preferred the established denomination over other churches," and (6) "used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function." *Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring in judgment); *see Kennedy*, 597 U.S. at 537 & n.5.

These hallmarks largely "reflect forms of coercion regarding religion or its exercise," *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring) (citation modified), which is what "the framers sought to prohibit when they adopted the First Amendment," *Kennedy*, 597 U.S. at 537; *see id.* 537 n.5. Accordingly, the "[g]overnment may not coerce anyone to attend church" or force anyone "to engage in a formal religious exercise," which would implicate the second and third hallmarks. *Id.* (quotations omitted).

The burden is on the plaintiff to prove "a set of facts that would have historically been understood as an establishment of religion," not on the defendant to prove that the challenged action is permissible based on historical practices. *Firewalker-Fields*, 58 F.4th at 123 n.7; *see Hilsenrath v. Sch. Dist. of Chathams*, 136

F.4th 484, 491 (3d Cir. 2025) (plaintiffs must show challenged action "resembles one of these hallmarks of religious establishment"), *cert. denied*, No. 25-256, 2025 WL 3506995 (U.S. Dec. 8, 2025). Because Plaintiffs cannot meet this burden, they attempted to jettison the hallmark analysis altogether. Instead, Plaintiffs argued that Act 573 is unconstitutional because "[t]he historical record demonstrates that there is no longstanding, widespread tradition of permanently displaying the Ten Commandments in public-school classrooms." R. Doc. 9, at 22. And the district court agreed. Add. 29; App. 412; R. Doc. 71, at 29. But that is wrong.

To be sure, "[w]here 'history shows that the specific practice is permitted,' [courts] typically need go no further; the Establishment claim fails." *New Doe Child*, 901 F.3d at 1021. The inverse, however, is not true. "[W]here history has not spoken to the 'specific practice' at hand," courts then "look to the historical understandings of the Establishment Clause as informed by other relevant practices." *Id.* And Plaintiffs bear the burden of showing the specific practice bears the "hallmarks of religious establishments." *Kennedy*, 597 U.S. at 537.

Plaintiffs cannot meet this burden because displaying the Ten Commandments fits within historical practices that were not understood to be religious establishments. There is an "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at

33

least 1789." *New Doe Child*, 901 F.3d at 1021 (quoting *Lynch*, 465 U.S. at 674); *see, e.g.*, *ACLU of Ohio v. Capitol Square Rev. & Advisory Bd.*, 243 F.3d 289, 292-99 (6th Cir. 2001) (en banc). That includes the Northwest Territory Ordinance of 1787, "which provided: 'Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.' " *Id.*; *see Hilsenrath*, 136 F.4th at 496 & n.5. And it includes Ten Commandments displays, which can serve as "a passive acknowledgement of the roles of God and religion in our Nation's history." *City of Plattsmouth*, 419 F.3d at 778.

Schools are not an exception to this history. Instead, they were another context where acknowledgement of God and religious beliefs were pervasive. *See* R. Doc. 57-1, at 23-35; Nathan S. Chapman, *Forgotten Federal-Missionary Partnerships: New Light on the Establishment Clause,* 96 Notre Dame L. Rev. 677 (2020). Although in the "early republican periods, there was no such thing as public education in the modern sense," there was also "no such thing as a secular school." Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I*, 44 Wm. & Mary L. Rev. 2105, 2171 (2003). And even after States had "established public school systems" in the 1800s, "public education was far from secular in character" as clergy often ran the schools. *Id.* at 2174. Even in 1960, the Bible continued to be read in public schools

and "50% reported" "homeroom daily devotional exercises."  Thomas H. Bickel, Engel *Was Grievously Wrong and Should Be Overruled*, 2023 Harv. J.L. & Pub. Pol'y Per Curiam 6, 1 (2023).  It is therefore unsurprising that even Green admitted that schools included Bible readings and references to the Ten Commandments throughout the 1800s and 1900s and the further back in time (*i.e.*, closer to the Founding) he looked, the more religious the schools and textbooks were.  App. 146-151; R. Doc. 8-12, at 19-24; App. 755-71.

This history demonstrates Act 573's requirement that schools post donated Ten Commandments displays on classroom walls is consistent with historical practices and does not violate the Establishment Clause, just like other public acknowledgments of God or the Ten Commandments.  *See, e.g.*, *New Doe Child*, 901 F.3d at 1022-23; *Van Orden*, 545 U.S. at 688-92.  And this conclusion is buttressed by corpus linguistics analysis that indicates "government displays of religious symbols" and "prayers or religious practices in public schools" would *not* be understood to violate the Establishment Clause's original meaning.  *See* Stephanie H. Barclay et al., *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, 509-10 (2019).

In short, Plaintiffs failed to show Act 573 has a single hallmark, much less that it is an establishment when the hallmarks are "considered in the aggregate."

*Hilsenrath*, 136 F.4th at 494-95 & n.3 (Phipps, J., concurring). Act 573 does not exert control over any churches, mandate church attendance, punish dissenting churches or individuals, restrict political participation, give money to an established church, or give an established church a monopoly over a civil function. Act 573 therefore does not violate the Establishment Clause.

The district court erred by concluding otherwise. And it erred by shifting the burden to Defendants and by relying on Green's conclusions. Although Plaintiffs bear the burden, the district court criticized Arkansas for not offering a competing expert at the preliminary-injunction stage who offered "opinions as to what the historical practices and understandings" were, App. 854 (243:11-14), and suggested its failure to do so means Green's opinion was "uncontroverted." Add. 27; App. 410; R. Doc. 71, at 27. But Green largely offered improper legal opinion about the original meaning of the First Amendment and Arkansas challenged his testimony and conclusions with evidence and arguments. *See, e.g.*, App. 174; R. Doc. 54; App. 851-58 (240:16-247:11). Even when the Supreme Court has not spoken on a particular issue, courts cannot delegate their duty of determining a constitutional provision's meaning to an "expert" and, when the Supreme Court has spoken, courts certainly cannot credit an expert's conclusion that is contrary to that precedent.

In any event, States do not need to incur the expense of hiring an expert (especially on the expedited preliminary-injunction timeframe) when courts can consider the historical evidence and sources for themselves when parties bring them to courts' attention. *See supra* 28. And the district court erred by concluding Green was credible as a legal and religious historian, including because his historical conclusions contradict Supreme Court precedent, App. 663 (52:1-17); App. 715-16 (104:4-105:2), he focused on what "James Madison and Thomas Jefferson were thinking," App. 745 (134:6-17), and did not consider the understanding of the public at the time of the Founding (including prominent voices, such as the Anti-Federalists "primarily because" they are "so voluminous," App. 731-33 (120:25-122:7)), he acknowledged his belief that "history is not objective," App. 724-25 (113:23-114:16), and he admitted glaring holes in his knowledge (including that he did not know what *Anno Domini* means or that the Continental Congress did not meet on Sundays), App. 747-50 (136:20-139:18). In any event, even considering Green's testimony about what constituted an establishment at the Founding, Plaintiffs failed to show they could prove that Act 573 is an establishment as originally understood.

#### *4. Plaintiffs cannot show that Act 573 displays are coercive.*

The district court treated the coercion question as a standalone hallmark of religious establishment and concluded Act 573 is impermissibly coercive. Add. 29-31; App. 412-414; R. Doc. 71, at 29-31. It is wrong on both fronts.

First, coercion is not a standalone hallmark of religious establishment, but rather a shorthand for the six "hallmarks of religious establishment" that can constitute an Establishment Clause violation. *See Kennedy*, 597 U.S. at 537 & n.5; *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring) (explaining that "most of these hallmarks reflect forms of coercion" (citation modified)). And even if viewed as a separate factor, any coercion inquiry must still be informed by history. *See New Doe Child*, 901 F.3d at 1020.

Second, even if coercion is an entirely separate factor, Plaintiffs failed to show Act 573 displays will be coercive. As explained above, Act 573 involves no coercion as historically understood. And as also explained above, original-Plaintiffs do not know what the displays in their classroom will look like or the surrounding context, and even added-Plaintiffs failed to introduce sufficient evidence about the surrounding context.

Regardless, like a motto, the displays "involve[] no coercion," do "not purport to compel belief or acquiescence," and do "not command participation in any form

of religious exercise." *Capitol Square*, 243 F.3d at 299. Plaintiffs' allegations boil down to them perceiving the displays as an endorsement of religion, being offended by that purported endorsement, and that purported endorsement somehow pressuring student-Plaintiffs into adopting the Ten Commandments as religious tenets. But endorsement is not the test. *See Kennedy*, 597 U.S. at 534. And Plaintiffs cannot repackage the endorsement test as a coercion test to try to evade the Supreme Court's clear guidance in *Kennedy* and *Galloway*.

Plaintiffs also cannot rely on offense to show coercion because "[o]ffense … does not equate to coercion." *Galloway*, 572 U.S. at 589 (plurality); *accord Kennedy*, 597 U.S. at 539, even if one is "continually confronted with 'what they feel is an offensive religious message,'" *New Doe Child*, 901 F.3d at 1024. "[T]he Constitution does not guarantee citizens a right entirely to avoid ideas with which they disagree" and is instead concerned about "the direct sort" of coercion that is not present here. *Galloway*, 572 U.S. at 589 (plurality) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 44 (2004) (O'Connor J., concurring)).

If "legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear," *id.* at 590, then Plaintiffs certainly cannot show that a passive, historical display of the Ten Commandments is impermissibly coercive. The display is not a religious exercise, unlike prayers, and

will not force students "to engage in a formal religious exercise," much less require them to do anything at all. *Kennedy*, 597 U.S. at 537. So "this case looks very different from those in which [the Supreme] Court has found *prayer* involving public school students to be problematically coercive," *id.* at 541-42 (emphasis added) (discussing *Lee v. Weisman*, 505 U.S. 577, 580 (1992); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 294 (2000)), and the district court erred by treating those cases as analogous, Add. 30; App. 413; R. Doc. 71, at 30; *see Lee*, 505 U.S. at 592 ("prayer exercises in public schools carry a particular risk of indirect coercion"); *Santa Fe*, 530 U.S. at 312 (prayer had the "improper effect of coercing those present to participate in an act of religious worship").

Furthermore, contrary to the district court's insistence that "[c]oercion is rife" in schools based on *Edwards*, Add. 30; App. 413; R. Doc. 71, at 30, that children might see a display in school does not transform the passive display into coercion under the Establishment Clause. *Edwards*'s instruction that, "in employing the three-pronged *Lemon* test," courts "must do so mindful of the particular concerns that arise in the context of public elementary and secondary schools," *id.* at 585, is far from persuasive when the Supreme Court has subsequently instructed that courts should *not* be applying *Lemon* or its progeny. While in the free-exercise context, there are some heightened concerns in the public-school context as it relates to "potentially

coercive nature of classroom instruction," *Mahmoud*, 606 U.S. at 554, a passive Ten Commandments poster is not classroom instruction. And it does not pressure students into altering their beliefs like teachers "reprimand[ing]" them for disagreeing with a book's viewpoint would, *id.* at 556, and it is nothing like coercion that was historically recognized as a religious establishment.

The district court was wrong to conclude that displaying the Ten Commandments in a public-school classroom is necessarily coercive (for all ages K-12) simply because students must attend school. Public schools do not need to be purged of anything with religious significance. Indeed, that contradicts the Supreme Court's repeated admonishment that the Establishment Clause does not " 'compel the government to purge from the public sphere' anything an objective observer could reasonably infer endorses or 'partakes of the religious.' " *Kennedy*, 597 U.S. at 535; *see New Doe Child*, 901 F.3d at 1022; *Hilsenrath*, 136 F.4th at 492. And even when children have observed religious activities and messages, courts have not concluded that government acknowledgement of religion becomes coercive. *See Galloway*, 572 U.S. at 591 (plurality) (children's attendance at town meetings did not transform legislative prayers into coercion); *id.* at 598 (Alito, J., concurring); *New Doe Child*, 901 F.3d at 1023-24, 1027 (children's need to carry money inscribed with "In God We Trust" did not make the "appearance" of that message "coercive"). In short, the

district court's analysis of Plaintiffs' establishment claims was wrong across the board.

## B. Plaintiffs' free-exercise claim fails.

The district court's conclusion regarding Plaintiffs' free-exercise claims is equally flawed. In the usual case, "the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." *Mahmoud*, 606 U.S. at 564. If a burden is found, courts will "ask if the burdensome policy is neutral and generally applicable." *Id.* If it is, then the free-exercise claim fails, *New Doe Child*, 901 F.3d at 1025; if it is not, then courts will "ask whether the policy can survive strict scrutiny," *Mahmoud*, 606 U.S. at 564.

When, however, "the burden imposed is of the same character as that imposed in [*Wisconsin v.*] *Yoder*, [406 U.S. 205 (1972)]," courts proceed straight to strict scrutiny. *Id.* at 564. A law or policy imposes that type of burden when "the educational requirement or curricular feature at issue" "'substantially interfere[es] with the religious development' of a child," such that it usurps parents' right to direct the upbringing of their children. *Id.* at 550 (quoting *Yoder*, 406 U.S. at 218). That question is "fact-intensive," turning on "the specific context in which the instruction or materials at issue are presented," including whether they are

"presented in a manner that is 'hostile' to religious viewpoints and designed to impose" pressure on students. *Id.*

### 1. Act 573 is a neutral, generally applicable law that does not burden religious exercise.

The district court concluded that Act 573 was not neutral and would likely "burden Plaintiffs' exercise of their sincere religious or nonreligious beliefs in substantial ways." Add. 31-32; App. 414-415; R. Doc. 71, at 31-32. This is mistaken.

Act 573 does not burden Plaintiffs' religious exercise. Act 573 is not directed at students at all, but to public schools that must post Ten Commandment displays if donated. And a poster on the wall does not require or "direct the Plaintiffs to *do* anything" either; it does not "force[] a person to act, or refrain from acting, in violation of his or her religious beliefs, by threatening sanctions, punishment, or denial of an important benefit." *New Doe Child*, 901 F.3d at 1026 (discussing what constitutes a substantial burden under RFRA); *see B.W.C. v. Williams*, 990 F.3d 614, 620 (8th Cir. 2021) (explaining "[r]eligious exercise is not burdened unless 'compliance cause[s] the objecting party to violate its religious beliefs, as it sincerely understands them'" (quoting *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 692 (2020) (Alito, J., concurring))); *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) (no free-exercise injury where plaintiff was not compelled or prohibited from doing anything "required by [her] religion" or compelled "to affirm or disavow a belief").

Nevertheless, the district court concluded otherwise, reasoning that Act 573 itself burdened Plaintiffs' free-exercise rights because donated "displays are likely to send an exclusionary and spiritually burdensome message." Add. 32; App. 415; R. Doc. 71, at 32. As a preliminary matter, original-Plaintiffs do not know what the displays and surrounding context will be in their classrooms, so they cannot show they will experience the offense the court assumed, especially when school districts want everyone to "feel included," App. 203, R. Doc. 58-1, at 26. And while added-Plaintiffs hypothesize the displays will allow teachers "to interject additional religious beliefs" into the classrooms, they do not show this actually occurred after displays were posted, *see* App. 491; R. Doc. 90-1, at 4; App. 597; R. Doc. 133-1, at 3, and even if they had, Act 573 does not direct teachers to provide instruction about the Ten Commandments unlike the challenged policy in *Mahmoud*, 606 U.S. at 560.

Simply because some students or parents may disagree with a perceived message on a classroom poster does not constitute a free-exercise burden. The Free Exercise Clause does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family," *Bowen v. Roy*, 476 U.S. 693, 699 (1986), nor does it allow citizens to dictate what the government may say on its classroom walls, *cf. Mahmoud*, 606 U.S. at 568 (emphasizing that parents were not seeking "the right to micromanage the public

school curriculum"); *Elk Grove*, 542 U.S. at 32 (Thomas, J., concurring) ("[T]he mere fact that [plaintiff] disagrees with this part of the Pledge does not give him a veto power over the decision of the public schools that willing participants should pledge allegiance to the flag in the manner prescribed by Congress.").

The district court reasoned that the passive displays would cause student-Plaintiffs to participate in a religious observance, *i.e.* a student may choose to read the text of the Ten Commandments on a poster. That is not a religious exercise—nor does reading a poster constitute a substantial burden, especially when students are not forced to read it or penalized for not reading it. *See Bauchman v. W. High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997) (free-exercise claim failed where choir member had a "choice whether or not to sing songs she believed infringed upon her exercise of religious freedom, with no adverse impact on her academic record"). Indeed, it is less of a burden than compelling *New Doe Child* plaintiffs to read, carry, and use money "emblazoned with the words 'In God We Trust'" which allegedly "forc[ed] them to affirm and spread a religious message with which they disagree." 901 F.3d at 1025-26. Yet this Court correctly concluded that "the statutes requiring the inscription of the national motto on U.S. coins and currency" did not impose a burden that could support a free-exercise or RFRA claim—even as to the child-plaintiffs in that case who lacked an alternative to using cash and even though

plaintiffs were "continually confronted" with what they perceived to be "an offensive religious message." *Id.* at 1018, 1024-27. As a law that requires public schools to post donated displays of historical representations of the Ten Commandments, Act 573 is nothing like laws that courts have concluded impose more than an incidental burden on religious exercise.

Moreover, because the Act is neutral and generally applicable, it creates no free-exercise problems. The district court concluded otherwise, reasoning that the Act "is not neutral with respect to religion" because it "mandates the display of expressly religious scripture." Add. 31; App. 414; R. Doc. 71, at 31. But as explained above, the district court is wrong in its characterization of the mandated text. Regardless, the Act applies the same way to everyone; it does not limit who can donate a display, target religious beliefs, provide exceptions, or "prohibit[] conduct because it is undertaken for religious reasons." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993); *see Doe No.1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, at *8 (6th Cir. Aug. 26, 2025) (a school-district policy "was generally applicable" where "it did not contain any discretionary mechanism for individual exemptions"). That Act 573 acknowledges religion or incorporates scripture does not negate its neutral and generally applicable nature; if it were otherwise, this Court would not have concluded that statutes requiring "In

God We Trust" to be inscribed on currency is "neutral and generally applicable." *New Doe Child*, 901 F.3d at 1025. Establishment Clause claims could simply be repackaged as free-exercise claims to "purge" all religious acknowledgments from the "public sphere," contrary to longstanding history, tradition, and practice. *Kennedy*, 597 U.S. at 535; *see, e.g.*, *Capitol Square*, 243 F.3d at 292 (explaining that Matthew 19:26 is the source of Ohio's official motto); 5 U.S.C. § 6103(a) (making "Christmas Day" a "legal public holiday[]"); *Ganulin v. United States*, 71 F. Supp. 2d 824, 829 (S.D. Ohio 1999) (dismissing claim alleging that § 6103 interferes with plaintiffs' ability to live "consistent[ly] with his beliefs and practices" and "to effectively instruct his children"), *aff'd*, 238 F.3d 420 (6th Cir. 2000).

Act 573 thus does not "burden anyone on the basis of religious belief" and is "neutral and generally applicable," *New Doe Child*, 901 F.3d at 1025, and the district court was wrong to conclude otherwise.

### 2. Act 573 does not substantially interfere with Plaintiffs' ability to direct student-Plaintiffs' religious upbringing.

To the extent the district court thought Plaintiffs could succeed on their free-exercise claims under *Mahmoud*, it is wrong on that front too. That is for at least three reasons.

First, if *Mahmoud* applies, the district court failed to do the "fact-intensive" analysis required to determine whether Act 573 would likely violate each parent-

Plaintiffs' right to direct the religious upbringing of their child. 606 U.S. at 550. Instead, it simply asserted displays would "usurp the fundamental rights of the parent-Plaintiffs" and "likely pressure the child-plaintiffs into religious observance" and cause them to "suppress[] expression of their own religious or nonreligious backgrounds and beliefs while at school." Add. 32; App. 415; R. Doc. 71, at 32. And its analysis regarding the added-Plaintiffs likelihood of success on their free-exercise claims was similarly conclusory. *See* Add. 37; App. 521; R. Doc. 111, at 2; Add. 40; App. 611; R. Doc. 149, at 2. The district court thus failed to analyze adequately "the specific religious beliefs and practices asserted" and whether the challenged displays could be considered "'hostile' to religious viewpoints" or designed to pressure students. *Mahmoud*, 606 U.S. at 550.

Second, the *Mahmoud* framework does not apply here. It applies when parents seek to opt-out of a particular educational requirement or curriculum that burdens their specific religious beliefs, not when parents seek removal of classroom posters in every single classroom in the school district—including classrooms their children will never enter. *Mahmoud* says, "[t]he question in cases of this kind is whether the *educational requirement* or *curriculum* at issue would 'substantially interfer[e] with the religious development' of the child or pose 'a very real threat of undermining' the religious beliefs and practices the parent wishes to instill in the child.'" *Id.* at 556

(quoting *Yoder*, 406 U.S. at 218) (emphasis added). *Mahmoud* repeatedly assumes the framework will apply only to "educational requirement[s]" and "curricular feature[s]." *See, e.g.*, *id.* at 550 (instructing that "the specific nature of the educational requirement or curricular feature at issue" must be considered); *Bethel*, 2025 WL 2453836, at *7 (concluding the *Mahmoud* framework did not apply because the challenged school policy "was not an educational requirement or curricular feature"). And *Yoder* likewise involved an educational requirement—that children attend formal schooling until 16—which substantially burdened the religious exercise of Amish parents who believed that formal high-school education was contrary to their values and way of life. *Mahmoud*, 606 U.S. at 549. It would thus be an extension of *Yoder* and *Mahmoud* to apply it to the State's decision about what should go on its classroom walls, especially when Plaintiffs are not seeking "to have their children opt out of a particular educational requirement" like *Mahmoud* plaintiffs but rather are seeking to "micromanage" what goes on every single classroom wall. *Id.* at 568; *see Bethel*, 2025 WL 2453836, at *7 n.3 (rejecting argument that *Mahmoud* "stands for the broad proposition that strict scrutiny is automatically triggered when a school does not allow religious students to opt out of any school policy that interferes with their religious development, including general operational policies that involve no instruction"); *cf. Rio Linda*, 597 F.3d at 1012-13 (rejecting

49

argument plaintiff has an establishment right "to prevent teachers from leading other students from reciting the Pledge of Allegiance").

Third, even if *Mahmoud's* framework is extended to apply beyond educational requirements and curriculum, Plaintiffs failed to show Act 573 will likely "substantially" burden religious exercise. Indeed, Act 573 could not be more different than the challenged policy in *Mahmoud*. In *Mahmoud*, the school board introduced "'LGBTQ+-inclusive' storybooks" and provided teachers with "associated educational instructions" that were "designed to 'disrupt' children's thinking about sexuality and gender." 606 U.S. at 529. The books did not just refer to things like "same-sex marriage as an existing practice" but instead presented "acceptance of same-sex marriage as a perspective that should be celebrated," and similarly presented child-gender transitioning as "highly positive." *Id.* at 552-53. Importantly, the books also presented "contrary view[s] as something to be reprimanded," and teachers were instructed to "reprimand" students. *Id.* at 553-54, 556.

In contrast, Act 573 calls for a passive display of a "historical representation" of the Ten Commandments to reflect the historical significance of the Ten Commandments for our Nation. Far from showing "'hostil[ity]' to religious viewpoints," *id.* at 550, the Act shows respect as a non-sectarian text was selected

instead of a version closely identified with a single faith tradition. What's more, there is no instruction that this version or the Ten Commandments are generally correct as a religious or philosophical matter, and school districts strive to be "inclusive of all religions" and make everyone "feel included." App. 203; R. Doc. 58-1, at 26. Plaintiffs have failed to show Act 573 will substantially interfere with their right to guide their students' religious upbringing.

While the district court reached the opposite conclusion, it just asserted a conclusion. *See supra* 47-48. That the court provided no analysis to support its conclusion, much less plaintiff-specific analysis, reflects the boilerplate nature of Plaintiffs' arguments. Rather than discuss the differences between Plaintiffs' differing religious and nonreligious beliefs or even student-Plaintiffs' ages—details that are important for the fact-intensive analysis *Mahmoud* dictates, 606 U.S. at 550—Plaintiffs argued in the abstract that the displays "will religiously coerce students" and will be an "assault on students' conscience," adding a footnote generally citing Plaintiffs' declarations. R. Doc. 58 at 41-42. All original-Plaintiffs offered was speculation, especially considering they did not know what donated display would be posted in their child's classroom or what the surrounding context would be. Although added-Plaintiffs offered some evidence regarding actual displays, they too failed to provide sufficient evidence regarding the context; instead,

they offered closely cropped pictures of three displays without even identifying what type of classroom in which they appeared.  R. Doc. 90-1, at 1; R. Doc. 90-2, at 1; R. Doc. 123-2, at 21.  Given courts "must also consider the specific context" when conducting the *Mahmoud* analysis, 606 U.S. at 550, Plaintiffs' failure to provide evidence regarding specific context means they failed to show likely success on their free-exercise claims.

Plaintiffs argued in the abstract because, while they all may have a "general legal, moral, ideological, or policy objection" to Act 573, *All. for Hippocratic Med.*, 602 U.S. at 381, Act 573 does not substantially interfere with the free-exercise rights of any of them.  *See supra* 43-47.  Take, for example, Plaintiff Christine Benson.  She admitted "the Ten Commandments are part of [her family's] faith system," but explained she thinks "Jesus's teachings in the New Testament are most central" and objects that Ten Commandments posters "send the opposite message." App. 596; R. Doc. 133-1, at 2.  And Benson implicitly acknowledged her child has not felt pressure to adopt the display's purported message given her child has felt free to express disagreement about the "propriety of the displays."  App. 597; R. Doc. 133-1 at 3.  The district court therefore erred by concluding that any, much less all, Plaintiffs were likely to succeed on their free-exercise claims.

**C. Plaintiffs failed to show likely success on their facial challenges.**

Although Plaintiffs chose to bring facial challenges, they did not show likely success under the appliable "rigorous standard." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). The district court recognized Plaintiffs brought a facial challenge (at least as to the establishment claims),[9] but failed to heed Supreme Court precedent regarding the heavy burden that entails—choosing instead to cite an earlier case applying the repudiated *Lemon* test. *See* Add. 8; App. 391; R. Doc. 71, at 8 (citing *Bowen v. Kendrick,* 487 U.S. 589, 601 (1988)).

Under Supreme Court precedent, facial challenges are disfavored because they "'often rest on speculation' about the law's coverage and its future enforcement" and "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *NetChoice*, 603 U.S. at 723 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008)). Accordingly, a plaintiff generally "cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" *Id.* at 723). To give "breathing room for free expression," the Supreme Court has

---

[9] Though the district court overlooked it, Plaintiffs also brought facial free-exercise claims. *See* R. Doc. 9, at 2, 29; R. Doc. 58, at 44.

"substituted a less demanding though still rigorous standard" for free-speech claims. *Id.*[10] But this slightly less demanding standard should be limited to free-speech claims. *See Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010).

Regardless, Plaintiffs cannot meet either standard. It did not show that there are "no set of circumstances" under which Act 573 could be constitutionally implemented, *NetChoice*, 603 U.S. at 723, nor that there would be a "lopsided ratio" of unconstitutional applications to constitutional ones, *United States v. Hansen*, 599 U.S. 762, 770 (2023). Indeed, Plaintiffs did not even try because they did not believe they had to meet that standard. They argued that, "[r]egardless of variations in content or the displays' surroundings," the one "constant"—the inclusion of the Ten Commandments—makes the Act facially unconstitutional. R. Doc. 58, at 1, 44. But the inclusion of the Ten Commandments does not automatically render something unconstitutional. Otherwise, there would not be countless cases recognizing that Ten Commandment displays are constitutional and cases recognizing that not all religious references must be scrubbed from schools. That means context matters—and the Act can undoubtedly by constitutionally applied, especially given that it allows people to donate Act 573 displays without prohibiting

---

[10] The Supreme Court has used the term "First Amendment cases" in *Moody*, 603 U.S. at 723, but seems to have applied this lower standard only in free-speech cases.

displays from containing other elements. And it is hard to see how any religious exercise could be substantially burdened by numerous possible iterations of a display, such as this one:[11]



The district court erred by refusing to acknowledge or apply the daunting standard for facial challenges when assessing likelihood of success.

## IV. PLAINTIFFS FAILED TO SHOW THE IRREPARABLE-HARM, BALANCE-OF-EQUITIES, OR PUBLIC-INTEREST FACTORS JUSTIFIED A PRELIMINARY INJUNCTION.

After the district court wrongly concluded that Plaintiffs would likely succeed, it essentially "presumed" Plaintiffs had satisfied the remaining factors. Add. 33, App. 416; R. Doc. 71, at 33. This was error.

Likelihood of success is only one factor. It is important to "assess[] the balance of equities and the public interest in determining whether to grant a preliminary injunction" in more than "a cursory fashion," *Winter*, 555 U.S. at 26, even when a plaintiff shows he will likely succeed on a First Amendment claim, *see NetChoice, LLC v. Fitch*, 145 S. Ct. 2658 (2025) (Kavanaugh, J., concurring in application denial).

Here, Plaintiffs failed to make a "clear showing" that the other factors justified the extraordinary remedy of injunctive relief. *Winter*, 555 U.S. at 22. Plaintiffs, especially original-Plaintiffs, failed to show "certain and great" harm "of such imminence" to establish a "clear and present need for equitable relief." *Powell*, 798 F.3d at 702; *see supra* 14-17. In contrast, enjoining enforcement of Arkansas's duly enacted statutes causes it and the public "irreparable harm," *see CASA*, 606

56

U.S. at 860-61, especially when an injunction is overbroad and based on a facial challenge that "prevent[s] duly enacted laws from being implemented in constitutional ways," *Moody*, 603 U.S. at 723.  Because Plaintiffs failed to show the remaining preliminary-injunction factors favored them, the district court erred by granting extraordinary relief.

## V.    THE PRELIMINARY INJUNCTIONS EXCEED THE DISTRICT COURT'S AUTHORITY.

Even if the Court agrees with Plaintiffs on some issues, it should still narrow the overbroad injunctions, so they do not extend beyond providing relief to Plaintiffs with a cognizable injury.

It is well-established that injunctions should be crafted only to "offer complete relief *to the plaintiffs before the court.*"  *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025); *see  Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (explaining that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982) ("An injunction must be tailored to remedy specific harm shown.").    Extending injunctions further to provide relief to others, even similarly situated individuals, exceeds the judicial power.  *See CASA*, 606 U.S. at 852-53, 856.

The district court flouted this instruction.  Rather than enjoining Defendants from enforcing Act 573 in student-Plaintiffs' classrooms or in student-Plaintiffs'

schools, the district court enjoined enforcement in *every* classroom in *every* school in Defendants' districts. And it did so based on evidence that some *other* students at some point have "occasionally travel[ed] from school to school to participate in" extracurricular activities *absent* "proof that any of the parent- or child-Plaintiffs participate" in those extracurriculars that may cause them to go into other schools. Add. 34; App. 417; R. Doc. 71, at 34. Plaintiffs failed to show complete relief required injunctions that extended beyond student-Plaintiffs' particular classrooms and libraries, so the district court lacked authority to issue such broad injunctive relief.

This judicial overreach cannot be justified by an invented concession, R. Doc. 107, at 6; R. Doc. 107-1 at 1-5, or by pretending Arkansas requested a novel "bubble injunction," Add. 38; App. 522; R. Doc. 111, at 3. An injunction could easily have been written to prohibit Act 573 displays in the "specific locations that Plaintiffs have identified" where their students will likely go. R. Doc. 107 at 6. The district court exceeded its authority by not doing so.

## Conclusion

For the foregoing reasons, the Court should reverse.

Respectfully submitted,

TIM GRIFFIN
Arkansas Attorney General

AUTUMN HAMIT PATTERSON
Solicitor General

LAURA PURVIS
Assistant Attorney General

OFFICE OF THE ARKANSAS
 ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 682-2007
autumn.patterson@arkansasag.gov
*Counsel for Intervenor-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,999 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Equity A, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson

## CERTIFICATE OF SERVICE

I certify that on January 9, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson