# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

Samantha Stinson *et al.*,

*Plaintiffs-Appellees*,

Julee Jaeger *et al.*,

*Plaintiffs-Appellees*,

Christine Benson *et al.*,

*Plaintiffs-Appellees*,

v.

Fayetteville School District No. 1 *et al.*,

*Defendants,*

Conway School District, No. 1,

*Defendant,*

Lakeside School District, No. 9,

*Defendant,*

State of Arkansas,

*Intervenor-Appellant.*

On Appeal from the United States District Court for the Western District of Arkansas, Case No. 25-cv-5127, Hon. Timothy L. Brooks

## Brief of National Education Association and Arkansas Education Association as *Amici Curiae* Supporting Appellees and Affirmance

Alice O'Brien
Beth Kurtz
National Education Association
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7035

Bradley Girard
Corenza Jean
Catherine M.A. Carroll
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for* Amici Curiae

# CORPORATE DISCLOSURE STATEMENT

The National Education Association is a nonprofit corporation organized under the laws of the District of Columbia. The Arkansas Education Association is a nonprofit corporation organized under the laws of Arkansas. Neither has any parent corporations, and no publicly held corporation owns any portion of any of them.

i

Appellate Case: 25-2713     Page: 2     Date Filed: 02/20/2026 Entry ID: 5610407

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ................................................................... i

Table of Authorities ................................................................................... iii

Introduction and Interests of *Amici Curiae* ................................................ 1

Argument ..................................................................................................... 3

I.    Act 573 puts teachers in an impossible position. ................................ 3

Conclusion ................................................................................................. 11

ii

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Am. Legion v. Am. Humanist Ass'n,*
     588 U.S. 29 (2019) ................................................................. 8

*Edwards v. Aguillard,*
     482 U.S. 578 (1987) ............................................................... 4

*Everson v. Bd. of Educ.,*
     330 U.S. 1 (1947) ................................................................... 5

*Kennedy v. Bremerton School District,*
     597 U.S. 507, 525, 542 (2022) ............................................... 4

*Lee v. Weisman,*
     505 U.S. 577 (1992) ............................................................ 4, 5

*Mahmoud v. Taylor,*
     606 U.S. 522 (2025) ........................................................... 6, 7

*Santa Fe Indep. Sch. Dist. v. Doe,*
     530 U.S. 290 (2000) ............................................................... 5

*Stone v. Graham,*
     449 U.S. 39 (1980) ................................................................. 2

*Town of Greece v. Galloway,*
     572 U.S. 565 (2014) ............................................................... 5

*Van Orden v. Perry,*
     545 U.S. 677 (2005) ............................................................... 4

*Wisconsin v. Yoder,*
     406 U.S. 205 (1972) ........................................................... 6, 7

**Statutes**

Arkansas
     Ark. Code Ann. § 6-1-101 ...................................................... 10
     Ark. Code Ann. § 6-10-139 ...................................................... 9
     Ark. Code Ann. § 6-17-2804 ................................................... 10

Appellate Case: 25-2713    Page: 4    Date Filed: 02/20/2026 Entry ID: 5610407

# INTRODUCTION AND INTERESTS OF *AMICI CURIAE*[1]

The National Education Association represents approximately three million members who serve as educators and education-support professionals in our nation's public schools and institutions of higher education. The Arkansas Education Association is NEA's Arkansas affiliate. Thousands of AEA's members work in Arkansas's K–12 public schools. Beyond designing lessons, teaching, and grading, these teachers also manage classrooms, mentor students, and maintain parent-teacher relationships.

NEA and AEA have a strong interest in ensuring their members can effectively educate and engage with their students in an environment free from religious coercion. It is NEA's official policy that the "choice of religion, including no religion, is an intensely personal decision," and that "instruction in religious doctrines and practices is best provided within a family setting and/or by religious institutions"—not by public schools. NEA Handbook, Resolution I-22 ("Freedom of Religion"), 331. Simply put, NEA and AEA members do not want to provide religious instruction to their students.

---

[1] *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

Appellate Case: 25-2713    Page: 5    Date Filed: 02/20/2026 Entry ID: 5610407

NEA and AEA agree with Plaintiffs that *Stone v. Graham,* 449 U.S. 39 (1980), resolves this case. Amici submit this brief to urge the Court to consider the perspective of the educators who will have to face the legal problems and everyday consequences in their classrooms caused by Act 573—precisely the kinds of problems the First Amendment was intended to prevent.

Specifically, Act 573's requirement that every classroom—no matter the subject—conspicuously display the Ten Commandments will mean that teachers will undoubtedly face a broad array of questions: Who is "the Lord thy God" and what does it mean to "have no other gods before me" or to "take the Name of the Lord thy God in vain"? What are graven images of God? What is the Sabbath and how does one keep it holy? Answering these questions—and countless more that are sure to be asked—will force legal and practical difficulties onto educators. They will have to respond to students in a way that does not violate either the Establishment Clause or the Free Exercise Clause. Without training or support, teachers will have to balance their role in supporting student inquiry and discussion while also constantly endeavoring to avoid coercing students into believing one set of religious beliefs, favoring one religion over another, or denigrating a student's religious beliefs. What's more, teachers will have to referee disagreements between students of different faiths and will have to

Appellate Case: 25-2713    Page: 6    Date Filed: 02/20/2026 Entry ID: 5610407

navigate relationships with parents, many of whom do not want their children's math or music teachers discussing religion with them.

Amici's members are committed public servants, seeking to use invaluable class time to teach course material and engage with students. This Court should reject Arkansas's attempt to distract from class time with the host of problems Act 573 will cause.

## ARGUMENT

### I. Act 573 puts teachers in an impossible position.

Across Arkansas, public-school educators work day-in and day-out to maintain an engaging school environment for every student, no matter their religious beliefs or lack thereof. Under Act 573, these teachers must now lead classrooms—including in math, science, and music—with conspicuously placed, overtly religious text on the wall. The State's only acknowledgment of the realities that teachers will face is that "Act 573 does not direct teachers to provide instruction" of the Ten Commandments. Arkansas Br. 44. Perhaps. But there can be little doubt that students will ask questions about the Ten Commandments required to be displayed in every single classroom. And in answering those questions, teachers will face a minefield of potential legal and practical consequences.

**A.** As public-school teachers, NEA and AEA members' instruction is constrained by the religion clauses of the First Amendment. Yet Act 573

3

puts teachers in the position to potentially violate both the Establishment Clause and the Free Exercise Clause.

**1.** The Establishment Clause prohibits the government from coercing individuals—even subtly—to participate in religious practice. *Lee v. Weisman*, 505 U.S. 577 (1992). There are "heightened concerns" regarding coercion in classrooms because of the "subtle coercive pressures" that exist in the public-school environment. *Id.* at 592, 588. And because students are required by law to attend school, they are a captive and impressionable audience with no choice but to be exposed to the lessons and messages presented by school officials. *Id.* at 598; *see also Van Orden v. Perry*, 545 U.S. 677, 703 (2005).

Against that backdrop, how can a teacher respond to questions about how to keep the Sabbath holy (or what day the Sabbath is), what happens to those who take the Lord's name in vain, or what counts as a graven image? Any answer from a teacher poses a heightened risk of coercion because students look up to teachers as role models. *See Edwards v. Aguillard*, 482 U.S. 578, 584 (1987). And unlike in *Kennedy v. Bremerton School District*, the students are a "captive audience" listening to official classroom instruction, not personal, private religious expression. *See* 597 U.S. 507, 525, 542 (2022). So the teacher must answer in a way that does

Appellate Case: 25-2713　　Page: 8　　Date Filed: 02/20/2026 Entry ID: 5610407

not pressure the students to conform to any religious belief—a tough sell considering that the discussion is about divine commandments.

The risk of coercion is compounded in the classroom because role-model teachers are speaking to students in front of their peers. Students are not yet "mature adults," so they are "readily susceptible to religious indoctrination," *Town of Greece v. Galloway*, 572 U.S. 565, 590 (2014), and "pressure from their peers towards conformity," *Lee*, 505 U.S. at 593. Teacher-led discussions about the Ten Commandments (even if instigated by student questions) will pressure students—especially students of minority faiths—to conform to their classmates' beliefs, lest they stand out for having different beliefs. If prayers over a loudspeaker at voluntary school events raise peer-pressure coercion concerns, *see Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000), surely those concerns are heightened in the classroom, where attendance is mandatory.

Public school teachers have long recognized that they cannot coerce students into religious belief. But teachers' careful attempts to avoid coercing students also cannot veer into denigrating the Ten Commandments, any particular faith, or religion overall. After all, the Establishment Clause forbids teachers to favor one religion over another, or to prefer either religion or nonreligion. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 18 (1947). So, for example, if a student chimes in to a discussion, raising

5

their sincerely held belief that everybody must follow the Ten Commandments, how does the teacher respond? Answers that communicate a message that the Ten Commandments are what they say—commandments that must be followed—risk unconstitutionally favoring the religious beliefs of students who agree. But answers that the Ten Commandments are not, in fact, universal commandments risk expressing disfavor toward students who believe otherwise. Neither Act 573 nor the State explain how teachers are supposed to navigate that impossible territory.

**2.** The constitutional thicket does not end at the Establishment Clause. The Free Exercise Clause prohibits teachers from interfering with a parent's right to direct their child's religious upbringing. *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972). So teachers cannot instruct students in a way that poses "a very real threat of undermining" the religious beliefs and practices that the parents wish to impress upon their children. *Mahmoud v. Taylor*, 606 U.S. 522, 556 (2025) (quoting *Yoder*, 406 U.S. at 218).

In light of these restrictions, how should a teacher respond when a Hindu student, who practices a polytheistic religion, challenges the Commandment to "have no other gods before me"? And what about a Buddhist student's nontheistic beliefs? As to those questions, the Ten Commandments "unmistakably convey a particular viewpoint," *Mahmoud*,

6

606 U.S. at 555-56—that those beliefs are wrong. How does a teacher explain that without "reinforc[ing] this viewpoint" or "reprimand[ing]" the students for expressing a different viewpoint? *See id.* at 556. The State acknowledges that reprimanding students for their religious beliefs violates the parents' right to direct their children's religious upbringing. Arkansas Br. 41 (citing *Mahmoud*, 606 U.S. at 556). But the State insists that the Ten Commandments are a purely passive display, *see id.*, contrary to the case law and the reality of classroom environments. As a result, the State fails to explain why inevitable classroom discussions would not "'substantially interfere' with the parents' ability to direct the 'religious development' of their children," *Mahmoud*, 606 U.S. at 554 (quoting *Yoder*, 406 U.S. at 218).

**B.** In addition to the constitutional issues presented by Act 573, displaying the Ten Commandments in classrooms will create a host of practical issues.

To begin, maintaining a safe and engaging environment for every student is a teacher's responsibility. And NEA's policy is that "for effective learning to take place, every student must be healthy, safe, engaged, supported, and challenged." NEA Handbook Policy Statement Regarding, Community Schools, 399. Act 573 makes this already-challenging obligation exponentially more difficult. Teachers will be forced to manage the reactions

7

of students who may feel ostracized in their classrooms and become disengaged or withdrawn because of the Ten Commandments display.

Worse yet, the display also increases the risk of tensions among students, as students may argue or bully one another over their religious perspectives. NEA policy provides that "education should foster a vibrant, pluralistic, and intrinsically equitable and just society that authentically reflects diverse populations and cultural perspectives." NEA Handbook, Resolution B-13 ("Diversity"), 214. A display that sows discord among students flies in the face of this policy. All of that is to say nothing of the time teachers will have to take away from daily lessons in math, grammar, or geography to instead field religious questions about the Ten Commandments.

Another practical issue is that most public-school teachers are not trained to handle discussions about the Ten Commandments. And Act 573 fails to provide any guidance for how teachers should respond when students ask questions. A math teacher is an expert in math, not religious studies. Biology teachers are not trained in how to lead discussions about the Sabbath. Certainly, some teachers are able to teach the "historical significance" of the Ten Commandments, including the "public depictions" that "'serve secular purposes,'" *see* Arkansas Br. 24 (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 53 (2019)). But the display will be a

8

prominent part of every classroom, and most teachers have received no training or resources to discuss such a sensitive topic.

Further, as a result of Act 573, teachers will be forced to confront questions about content that may not be suitable for certain age groups. When a second-grader asks a teacher what it means to "commit adultery" or "covet thy neighbor's wife," the teacher will be faced with a situation that is not only unrelated to the curriculum but also an inappropriate topic of discussion for second-grade classrooms. And conversations about adultery and coveting could risk running afoul of Arkansas's Religious Viewpoint Antidiscrimination Act, which requires school districts to take steps to prevent students from engaging in speech that is obscene, vulgar, offensively lewd, or indecent. Ark. Code Ann. § 6-10-139.

Finally, answering students' questions about the Ten Commandments risks creating conflicts between teachers and parents who are supposed to work together in the best interests of the student. For example, Plaintiff Carol Vella stated that "[she] do[es] not want teachers answering questions about the Ten Commandments in front of [her] children, and [she] do[es] not want a Christian version of the Ten Commandments imposed on [her] children for nearly every hour they are in school, in accordance with Act 573, because it will directly interfere with [her] role as a parent and substantially burden [her] religious exercise." App. 112; R. Doc. 8-8, at 4

9

Appellate Case: 25-2713     Page: 13     Date Filed: 02/20/2026 Entry ID: 5610407

(Decl. of Carol Vella). NEA and AEA members agree: "[I]nstruction in religious doctrines and practices is best provided within a family setting and/or by religious institutions"—not by public-school teachers. NEA Handbook, Resolution I-22 ("Freedom of Religion"), 331. But when teachers are forced to field questions about the Ten Commandments, they risk interfering with how parents address religious topics ranging from the existence of God to whether it is wrong for a mother to work on Sundays to provide for her children.

**C.** Instead of addressing these problems, the State insists that Act 573 does not affirmatively require teaching the Ten Commandments. Arkansas Br. 47. But even if requiring the conspicuous display of the Ten Commandments in every classroom were not itself a constitutional violation (which it is), the presence of the Ten Commandments display may well provoke constitutional violations as classrooms grapple with the meaning of the display.

What's more, the State's argument rests on a premise that is antithetical to the role of a teacher. Students learn by asking questions and engaging with their teachers. And "student learning is the foundation of teacher effectiveness." Ark. Code Ann. § 6-17-2804. Students naturally will be curious about any poster displayed in the classroom and ask their teachers questions—that's a good thing. But telling teachers that they are not

10

required to discuss materials that they *are* required to post in their classrooms makes no sense. And it undermines the important role of educators in helping students develop critical-thinking skills.

## CONCLUSION

The district court's preliminary injunction should be affirmed.

Respectfully submitted,

 /s/ *Bradley Girard*

Alice O'Brien
Beth Kurtz
National Education Association
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7035

Bradley Girard
Corenza Jean
Catherine M.A. Carroll
Democracy Forward Foundation
P.O. Box 34556
Washington, D.C. 20043
(202) 448-9090

*Counsel for* Amici Curiae

February 18, 2026

11

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i) complies with the type-volume limitation of Rule 29(a)(5) and Rule 32(a)(7)(B) because it contains 2,249 words including footnotes and excluding the parts of the brief exempted by Rule 32(f);

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger; and

(iii) complies with Circuit Rule 28A(h) because it has been scanned for viruses and is virus free.

/s/ *Bradley Girard*

## CERTIFICATE OF SERVICE

I certify that on February 18, 2026 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ *Bradley Girard*